MEMORANDUM **
Klamath-Siskiyou Wildlands Center, Oregon Wild, and Cascadia Wildlands (collectively “Klamath-Siskiyou”) appeal the district court’s order and judgment in favor of the United States Bureau of Land Management and a field manager thereof, John Gerritsma, in his official capacity (collectively “BLM”).[1] We affirm.
Klamath-Siskiyou brought this action pursuant to the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (“APA”) after BLM approved the Rio Climax Forest Management Project (“the Project”) and, more particularly, approved the revised Environmental Assessment (“EA”) for the Project. Klamath-Siskiyou asserts that the EA was deficient in a number of respects and that BLM failed to follow its land use plan for the Project area. These shortcomings, it argues, rendered BLM’s actions arbitrary and capricious. See 5 U.S.C. § 706(2)(A); see also Great Basin Mine Watch v. Hankins, 456 F.3d 955, 961-62 (9th Cir.2006); Hells Canyon All. v. U.S. Forest Serv., 227 F.3d 1170, 1176-77 (9th Cir.2000). We disagree. In reviewing BLM’s actions, “ ‘we do not substitute our judgment for that of the agency.’” Lands Council v. McNair, 629 F.3d 1070, 1074 (9th Cir.2010). On the contrary: “Agency action is valid if the agency ‘considered the relevant factors and articulated a rational connection between the facts found and the choices made.’ ” Id. Moreover, we must be particularly careful to avoid thinking of ourselves as “‘a panel of scientists’” rather than showing the deference owed to the agency’s scientific specialists. Id.
(A) NEPA[2]
NEPA required that BLM “ ‘consider every significant aspect of the environmental impact’” of the Project[3] and inform the public that it had done so.[4] In carrying out those functions, it prepared the EA and determined that it need not prepare an Environmental Impact Statement. See Native Ecosystems Council v. U.S. Forest Serv. (Native Ecosystems Council), 428 F.3d 1233, 1238-39 (9th Cir.2005). It, therefore, issued a finding to that effect. See id. at 1239. Klamath-Siskiyou asserts that BLM did not take the required “hard look” before it reached its decision,[5] but we disagree.
We have carefully reviewed the administrative record and agree with the district court that the EA was sufficient and justified BLM’s actions. Succinctly put:
(1) BLM was not required to set forth the exact locations and numbers of trees that would, or might, be removed for the purpose of exerting some control over mistletoe growth without ignoring that parasite’s (disease’s) beneficial effects in the forest ecosystem. It was sufficient for *651 the EA to describe what forest conditions then existed and to carefully explain what, by using the proposed management practices, the forest conditions would be after BLM had done the proposed density and disease control work.
(2) The EA and BLM decision did not take what amounted to antithetical positions regarding old-growth trees. BLM proposed to remove some mistletoe-infected trees and to leave old-growth trees. True, the latter might have had mistletoe infections. But BLM made it clear that old-growth trees, as defined in the EA, would not be removed, and nothing in the record indicates the contrary. Put otherwise, the fact that some mistletoe-infected trees would be removed and that some old-growth trees were infected does not lead to a logical conclusion that some mid-growth trees would be removed.
(3) Klamath-Siskiyou asserts that improper (illegal) off-highway-vehicle incursions might occur. But the EA recognized that possibility and carefully detailed steps that would be taken to preclude, or at least greatly minimize, the problem. BLM reasonably concluded that there would be few or no impacts and sufficiently discussed the risks posed by off-highway-vehicle use in light of that conclusion. Of course, there is and always will be the possibility of illegal activity by others, but if that were sufficient to preclude BLM action, it could never act at all.
(B) FLPMA[6]
Under FLPMA, BLM was required to propose a proper land use plan,[7] and once, that was adopted, BLM was required to adhere to it.[8] Our review of the record satisfies us that BLM did adhere to the Plan. Again, succinctly put:
(1) Klamath-Siskiyou maintains that the Plan required that every management action by BLM maintain or improve soil productivity and that the Project will decrease productivity to some extent. However, that misstates the Plan, which, rather, states that soil improvement is a desideratum and requires use of the best management practices, but which also recognizes that any surface disturbance may cause some relatively minor losses, even though many steps will be taken to minimize those while improving the overall health of the forest. In short, there is no absolute maintain-or-improve rule. Therefore, the losses of soil productivity that are expected to result from the Project are permitted by the Plan. The district court did not err.
(2) Klamath-Siskiyou then asserts that the EA is not consistent with the Plan’s provisions regarding fragile soils. Kla-math-Siskiyou did not specifically raise its fragile-soils claim during the administrative proceedings, as it should have done. See Lands Council, 629 F.3d at 1076. Nevertheless, we will consider the argument on its merits. See id.; cf. Buckingham v. Sec’y of the U.S. Dep’t of Agric., 603 F.3d 1073, 1080-81 (9th Cir.2010). Again, however, the district court did not err. The record shows that in the EA BLM did carefully consider the nature of the soils that it would impact within the Project area, and it did not find any of them to be fragile. Unsurprisingly, Kla- *652 math-Siskiyou did not point to any evidence in the record that there were fragile soils; it did not refer to fragility at all during the administrative proceedings. Of course, Klamath-Siskiyou does now claim that Map 6 in the Plan is sufficient to show that fragile soils will be impacted. We disagree. That map is, as BLM pointed out, an indication of areas that might contain fragile soils rather than a determination that those areas do contain fragile soils, in whole or in any particular part. That is something that had to be determined on the ground when a project was proposed.
The disclaimer on Map 6 is expansive: “The Bureau of Land Management cannot assure the reliability or suitability of this information for a particular purpose. Original data was compiled from various sources. Spatial information may not meet National Map Accuracy Standards. This information may be updated without notification.” We 'find it counterintuitive that Map 6 details definitive fragile-soils designations in the face of clear language disclaiming “the reliability or suitability of this information for a particular purpose” and warning that the “information may be updated without notification.” Instead, we hold that Map 6 is not a binding determination of the exact locations of fragile soils.
The dissent points out that the same disclaimer is on all but one of the other maps in the RMP. This fact does not change our conclusion. Like Map 6, all the other maps with the disclaimer are illustrative rather than depictions creating static, binding obligations on BLM. For instance, many of the other maps detail land designations that have changed since the RMP’s creation in 1995. To hold that the maps from 1995 require BLM to manage the land in conformity with outdated land designations would be illogical.
Finally, both the dissent and Klamath-Siskiyou claim that our holding hollows out BLM’s obligations under the RMP because BLM can now avoid those obligations by simply changing geographic designations without public oversight. We respectfully disagree. Our holding does not grant BLM the carte blanche right to trample on fragile soils. BLM is undisputedly bound by the RMP, including its fragile-soils requirements. We simply hold that Map 6 is not an exact representation of where those fragile soils actually exist. Accordingly, the fragility of the soil must be determined from a project-specific soil analysis rather than from a coarse-scale map covering 859,000 acres.
AFFIRMED.

 This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

.What we hold here also applies to the Inter-venors, Rough & Ready Lumber Company, Farmer Logging, and Greg Liles Logging. Thus, we will not refer to them separately.

. National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4370h.

. Conservation Cong. v. Finley, 774 F.3d 611, 615 (9th Cir.2014).

. Id.

. See Ctr. for Biological Diversity v. Salazar, 695 F.3d 893, 916-17 (9th Cir.2012); Native Ecosystems Council, 428 F.3d at 1239.

. Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701-1787.

. See Klamath Siskiyou Wildlands Ctr. v. Boody, 468 F.3d 549, 555-56 (9th Cir.2006). Here that plan was the Medford District Resource Management Plan ("the Plan”).

. See Or. Nat. Res. Council Fund v. Brong, 492 F.3d 1120, 1125 (9th Cir.2007); Klamath Siskiyou, 468 F.3d at 556.